# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
No. 19-1969V
UNPUBLISHED

| | |
|---|---|
| BRIAN STROMER,<br><br>　　　　　　　　Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>　　　　　　　　Respondent. | Chief Special Master Corcoran<br><br>Filed: April 8, 2022<br><br>Special Processing Unit (SPU);<br>Entitlement to Compensation; Ruling<br>on the Record; Findings of Fact;<br>Onset; Influenza (Flu) Vaccine;<br>Shoulder Injury Related to Vaccine<br>Administration (SIRVA) |

*Alison H. Haskins*, Maglio Christopher & Toale, PA, Sarasota, FL, for Petitioner.

*Lauren Kells*, U.S. Department of Justice, Washington, DC, for Respondent.

### RULING ON ENTITLEMENT AND DECISION AWARDING DAMAGES[1]

On December 30, 2019, Brian Stromer filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that he suffered a shoulder injury related to vaccine administration ("SIRVA") caused by an influenza ("flu") vaccine administered on October 18, 2018. Petition at 1. The case was assigned to the Special Processing Unit of the Office of Special Masters.

---

[1] Because this unpublished fact ruling contains a reasoned explanation for the action in this case, I am required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means the fact ruling will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

For the reasons described below I find that Petitioner is entitled to compensation, and I award $145,000.00, for past pain and suffering, plus $500 per year for future pain and suffering, reduced to net present value.

## I.     Relevant Procedural History

Shortly after the claim's initiation, Petitioner filed a statement of completion on January 10, 2020. ECF No. 8. On May 18, 2020, Respondent filed a status report stating that a preliminary review of the case did not identify any missing records or issues that required additional support. ECF No. 16. Ten months later, on March 17, 2021, Respondent filed a status report stating that he was amenable to settlement negotiations. ECF No. 28. However, Petitioner indicated on May 17, 2021, that discussions regarding informal resolution had failed. ECF No. 32.

Petitioner thereafter filed a motion for a ruling on the record regarding entitlement and damages on June 24, 2021. Petitioner's Motion for Ruling on Entitlement and Damages ("Mot."), ECF No. 35. Petitioner argued that he meets the table definition of a SIRVA, and requested an award of $210,000.00 for actual pain and suffering, in addition to $1,200.00 per year for future pain, suffering, and emotional distress. Mot. at 18, 22.

Respondent filed his response on July 29, 2021. Respondent's Rule 4(c) Report and Response to Petitioner's Motion for a Ruling on Entitlement and Damages ("Opp."), ECF No. 37. Respondent argued in part that Petitioner had failed to establish a Table claim because the onset of his shoulder pain did not occur within 48 hours of his vaccine, and that the record revealed his pain was not limited to his left shoulder. Opp. at 11-15.[3] Respondent otherwise proposed an award of $122,500.00 for actual pain and suffering if entitlement was found in favor of Petitioner, with no future component. Opp. at 23.

Petitioner filed a reply on August 16, 2021, addressing Respondent's arguments. Petitioner's Reply to Respondent's Rule 4(c) Report and Response to Petitioner's Motion for a Ruling on Entitlement and Damages ("Reply"), ECF No. 39. This matter is now ripe for resolution.

## II.    Petitioner's Medical History

Petitioner received the flu vaccine on October 18, 2018, in his left shoulder. Ex. 1 at 1. Less than a month later, on November 2, 2018, Petitioner presented to Dr. John Gorski with complaints of left shoulder pain and weakness. Ex. 6 at 26. Petitioner reported his pain and weakness "developed after he was administered the influenza vaccination

---

[3] Respondent also argues that Petitioner has not established causation-in-fact. Opp. at 15-16.

2

at work." *Id.* at 27. Upon examination, Petitioner exhibited reduced range of motion, tenderness, pain, and weakness in his left upper arm. *Id.*

Petitioner saw a neurologist, Dr. Michael Nissenbaum, on November 5, 2018. Ex. 16 at 1. Petitioner reported "severe left upper extremity pain following a flu shot." *Id.* The record also states that Petitioner "received a flu shot about two to three weeks ago and since [that time] he has described worsening neuropathic pain in left deltoid muscle radiating from elbow to the shoulder." *Id.* An examination showed severe pain, limited strength in his left shoulder, but intact sensation. *Id.* Dr. Nissenbaum noted that the symptoms may represent inflammation or brachial neuritis. *Id.* at 2.

On November 8, 2018, Petitioner was evaluated by Dr. David Tuckman, an orthopedic surgeon. Ex. 3 at 3. Petitioner reported left shoulder pain that had been present for three weeks, and that the onset occurred after a flu shot. He also reported a pain level of 8 out of 10, weakness, decreased range of motion, and sleep disturbance. *Id.* Petitioner was assessed with left shoulder impingement syndrome and rotator cuff tendonitis "likely secondary to flu shot." *Id.* at 4. A steroid injection was administered, and Petitioner was advised to rest, use ice, modify his activities, and engage in a home exercise program.

Petitioner saw a second orthopedic surgeon, Dr. Eric Freeman, on November 28, 2018. Ex. 4 at 9. The record states under history of present illness "[l]eft shoulder impingement as a result of a flu shot." *Id.* Dr. Freeman also noted that "at this point in time, I do feel this is of causality to the injection." *Id.* at 10. An MRI performed the next day showed infraspinatus tendinosis, moderate to high grade partial thickness articular sided tear, mild to moderate joint arthrosis, and very mild bursitis. *Id.* at 17.

Petitioner saw Dr. Freeman again on December 4, 2018. At that time, Petitioner reported he was miserable, with continued shoulder pain radiating down his arm. Ex. 4 at 8. Due to significant pain, Dr. Freeman saw Petitioner "on an emergency basis" on December 6, 2018. *Id.* at 7. He now reported a pain level of 10/10 and exhibited an extremely limited range of motion. *Id.* Petitioner was assessed with "impingement disease in the left shoulder and a probable neurologic issue as well" and may be developing adhesive capsulitis. *Id.* Dr. Freeman prescribed a Medrol dosepak and Vicodin. *Id.* at 6-7. An EMG/NCS of Petitioner's left upper extremity on December 7, 2018, revealed no evidence of neuropathy. *Id.* at 11.

A follow-up with Dr. Freeman occurred on December 27, 2018. At that time, Petitioner continued to report significant pain (10 out of 10), and that he had attempted

physical therapy but could not follow through due to the pain. Ex. 4 at 4. Petitioner also continued to show positive impingement signs. Surgery was recommended. *Id.*

On January 1, 2019, Petitioner underwent pre-surgical testing. Ex. 5 at 6. He reported that his left shoulder pain began in November of 2018 "after a flu shot." He also reported increased pain over the last month with burning down his arm and decreased range of motion. *Id.* A bit more than two weeks later, arthroscopic surgery was performed on January 18, 2019, consisting of anterior acromioplasty, distal clavicular excision with extensive debridement of the glenohumeral joint. Ex. 4 at 18-19. At a follow-up on January 21, 2019, Petitioner reported he was doing well. *Id.* at 3.

Petitioner underwent an independent orthopedic evaluation for purposes of a worker's compensation claim on February 13, 2018, performed by Dr. Michael Miller. Ex. 9 at 22. Dr. Miller noted onset of Petitioner's shoulder pain was two days after his vaccine, with no intervening incident or trauma. *Id.* Upon examination, Petitioner exhibited significant deficits in range of motion. *Id.* at 23. Dr. Miller diagnosed Petitioner with a SIRVA. *Id.* Later that month, Petitioner followed up with Dr. Freeman. At that time, he reported pain levels of 3/10, and that he had begun doing some home exercises. Ex. 4 at 2.

Petitioner started physical therapy on March 19, 2019. Ex. 2 at 2. He stated that "onset of his condition began on 10/18/18 after he got a flu shot" and reported pain of 6/10 at rest and 8/10 with activity. *Id.* at 3. He attended 61 physical therapy sessions between March 19 and November 7, 2018. Ex. 2 at 2-18; Ex. 11 at 2-49; Ex. 21 at 2-4. Throughout March and August, Petitioner complained of moderate pain, often rating it at 4-6 out of 10. *See* Ex. 2 at 6 (physical therapy record from March 23, 2019, rating his pain as 4/10); Ex. 11 at 32 (record from August 17, 2019, rating his pain as 6/10).

On April 8, 2019, Petitioner returned to Dr. Freeman and reported he was "doing great", and an examination indicated "almost full mobility." Ex. 9 at 3. Petitioner again saw Dr. Freeman on May 16, 2019. *Id.* at 2. At that time there were no reports of pain, no signs of impingement, and his range of motion had increased. *Id.* Petitioner also indicated that his workers' compensation claim was approved. *Id.* On June 3, 2019, Petitioner saw Dr. Freeman. Ex. 18 at 21. Upon examination, he exhibited mild endpoint pain but excellent range of motion and no joint instability. *Id.*

Petitioner's seeming improvement did not hold. At a follow-up appointment on July 15, 2019, with Dr. Freeman, Petitioner reported pain of 5/10, and an MRI was ordered. Ex. 18 at 20. The MRI showed tendinosis, mild partial thickness tear of the distal

4

infraspinatus tendon and erosion in the posterior humeral head, but no bursitis. Ex. 10 at 5.

Petitioner thereafter continued to complain of "significant pain" through August. *See*, e.g., Ex. 11 at 37 (physical therapy record from August 31, 2019). Due to increased pain, Petitioner had difficulty elevating his arm, carrying items, opening or closing doors, dressing and buttoning his shirts, and completing household chores. *Id.* However, on August 19, 2019, Petitioner reported only mild pain of 2/10 to Dr. Freeman. Ex. 18 at 17. Blood tests were ordered to rule out an infection, which were negative. *Id.*

On September 3, 2019, Petitioner saw Dr. Freeman again. Ex. 18 at 15. Dr. Freeman indicated there were no signs of neurovascular changes but was considering referring Petitioner to a pain management specialist due to reports of pain that were "out of proportion with what the findings were surgically…." *Id.* He also ordered a bone scan to rule out reflex sympathetic dystrophy ("RSD"). Ex. 10 at 7. A bone scan on September 10, 2018, revealed no evidence of RSD. *Id.* at 2. Petitioner returned to Dr. Freeman on September 24, 2019. Ex. 18 at 14. At that time, Dr. Freeman noted there is no infection or RSD, and that Petitioner was "dealing with some post-traumatic issues." *Id.*

Petitioner began to report less pain throughout October, November, and December of 2019. Ex. 11 at 45, 48. During that time, he reported pain as low as 0 (Ex. 18 at 13), but often 2-3 out of 10. Ex. 18 at 13 and 11, Ex. 11 at 45 (physical therapy record from October 19, 2019, reporting pain as 2/10); Ex. 21 at 3 (physical therapy record from November 2, 2019, reporting pain as 2/10 and increased range of motion).

Dr. Freeman conducted an orthopedic consultation for workers' compensation claim purposes on January 8, 2020. Ex. 18 at 9. Dr. Freeman stated that Petitioner reached the "maximum medical improvement" and was entitled to 22.5% schedule loss of use of his left shoulder. *Id.* Dr. Freeman also stated that Petitioner exhibited a permanently reduced range of motion, which was largely unchanged since October 18, 2018, at 170 degree flexion, internal rotation to L2, and external rotation with arms at side to 35 degrees. *See* Ex. 18 at 36 (record from October 18, 2018) and *id.* at 9 (record from January 8, 2020).

A second independent medical examination was performed by Dr. Miller on February 25, 2020. Petitioner reported that his shoulder pain was intermittent but

5

aggravated by use. Ex. 20 at 55. He also reported difficulty sleeping, raising his arm, and heavy lifting. An examination indicated significant reduced range of motion. *Id.* at 57.[4]

### III.     Affidavit Evidence

Petitioner filed an affidavit in support of his claim on May 21, 2021. Ex. 22. In it, he states that the vaccination on October 18, 2018, was "given very high up" on his left arm and was very painful. *Id.* at 1. He further states that he awoke on October 20, 2018, in "excruciating pain" from his left shoulder. Ex. 22 at 1-2. Petitioner explained that his shoulder pain impacted his daily life, and he was unable to do many tasks. *Id.* at 2. Petitioner also stated that sometimes "bursts of pain, seemed to radiate down my left arm when I moved it. My pain did not radiate upward, nor did it originate from anywhere other than my shoulder area." *Id.*

Petitioner's wife, Kamila Stromer, submitted a declaration in support of this petition as well. Ex. 23. Mrs. Stromer stated that Petitioner complained of shoulder pain the day of his vaccination, and it became continuously worse. *Id.* at 1-2. Mrs. Stromer provided additional corroborating evidence regarding how Petitioner's shoulder pain impacted his daily life, including how it changed his ability to interact with his wife and daughters. *Id.* at 2-3.

### IV.     Parties' Arguments

Petitioner requests that I issue a ruling finding that he is entitled to compensation in this case. Mot. at 1. He avers that he meets the requirements for a SIRVA as described in the Vaccine Injury Table, and thus is entitled to a presumption of causation. Mot. at 14-16. Respondent argues that Petitioner has failed to show he suffered a Table claim because onset of his pain was not within 48 hours of his vaccination and his pain was not limited to his left shoulder. Opp. at 11-15.

### V.      Fact Findings and Ruling on Entitlement

Pursuant to Vaccine Act Section 13(a)(1)(A), a petitioner must prove, by a preponderance of the evidence, the matters required in the petition by Vaccine Act Section 11(c)(1). In addition to requirements concerning the vaccination received, the

---

[4] Dr. Miller noted that Petitioner demonstrated a significantly greater range of motion in Dr. Freeman's examination from January 8, 2020. Ex. 20 at 57. Dr. Miller concluded that Petitioner's range of motion was self-restricted, and the measurements made by Dr. Freeman more reliable. *Id.*

duration and severity of petitioner's injury, and the lack of other award or settlement,[5] a petitioner must establish that he suffered an injury meeting the Table criteria, in which case causation is presumed, or an injury shown to be caused-in-fact by the vaccination she received. Section 11(c)(1)(C).

The most recent version of the Table, which can be found at 42 C.F.R. § 100.3, identifies the vaccines covered under the Program, the corresponding injuries, and the time period in which the particular injuries must occur after vaccination. Section 14(a). Pursuant to the Vaccine Injury Table, a SIRVA is compensable if it manifests within 48 hours of the administration of an influenza vaccine. 42 C.F.R. § 100.3(a)(XIV)(B). A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:

> (i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;
>
> (ii) Pain occurs within the specified time frame;
>
> (iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and
>
> (iv) No other condition or abnormality is present that would explain the patient's symptoms (*e.g.* NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10).

A special master must consider, but is not bound by, any diagnosis, conclusion, judgment, test result, report, or summary concerning the nature, causation, and aggravation of petitioner's injury or illness that is contained in a medical record. Section 13(b)(1). "Medical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally

---

[5] In summary, a petitioner must establish that she received a vaccine covered by the Program, administered either in the United States and its territories or in another geographical area but qualifying for a limited exception; suffered the residual effects of her injury for more than six months, died from her injury, or underwent a surgical intervention during an inpatient hospitalization; and has not filed a civil suit or collected an award or settlement for her injury.  *See* § 11(c)(1)(A)(B)(D)(E).

contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Accordingly, where medical records are clear, consistent, and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Hum. Servs.*, No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). However, the Federal Circuit has recently "reject[ed] as incorrect the presumption that medical records are always accurate and complete as to all of the patient's physical conditions." *Kirby v. Sec'y of Health & Hum. Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021). Medical professionals may not "accurately record everything" that they observe or may "record only a fraction of all that occurs." *Id.*

Medical records may be outweighed by testimony that is given later in time that is "consistent, clear, cogent, and compelling." *Camery v. Sec'y of Health & Hum. Servs.*, 42 Fed. Cl. 381 at 391 (1998) (citing *Blutstein v. Sec'y of Health & Hum. Servs.*, No. 90-2808, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998). The credibility of the individual offering such testimony must also be determined. *Andreu v. Sec'y of Health & Hum. Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Hum. Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id*.

The special master is obligated to fully consider and compare the medical records, testimony, and all other "relevant and reliable evidence contained in the record." *La Londe Sec'y of Health & Hum. Servs.*, 110 Fed. Cl. 184 at 204 (2013) (citing § 12(d)(3); Vaccine Rule 8); *see also Burns v. Sec'y of Health & Hum. Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (holding that it is within the special master's discretion to determine whether to afford greater weight to medical records or to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is rational).

### A. Factual Findings Regarding a Table SIRVA

After a review of the entire record, I find that a preponderance of the evidence demonstrates that Petitioner has satisfied the QAI requirements for a Table SIRVA.

### 1. Petitioner has no Prior Left Shoulder Condition or Injury

The first requirement for a Table SIRVA is a lack of problems associated with the affected shoulder prior to vaccination that would explain the symptoms experienced after vaccination. 42 C.F.R. § 100.3(c)(10)(i). Respondent has not contested that Petitioner meets this criterion, and I find that he has demonstrated a lack of history of pain, inflammation, or dysfunction of his left shoulder that would explain his symptoms. *See* Ex. 9 at 23 (stating that Petitioner reported no left shoulder problems prior to the flu vaccine injection).

### 2. Onset of Petitioner's Injury Occurred within Forty-Eight Hours of his Vaccination

The aforementioned medical records, coupled with Petitioner's witness statements, establish that Petitioner consistently reported to treaters onset close-in-time to vaccination, that he sought treatment the month after his October 2018 vaccination, and that he indeed was experiencing symptoms in the relevant timeframe. Ex. 3 at 3-4; Ex. 6 at 26-27; Ex. 16 at 1; Ex. 22 at 1.

Respondent argues that reports of Petitioner's onset are vague and varied. Opp. at 11-12. Respondent cites to records that generally state Petitioner developed pain "after" he was administered the influenza vaccination, but without identifying a date. Opp. at 12 citing Ex. 16 at 1; Ex. 5 at 6. Respondent also notes that it was not until Petitioner sought workers' compensation benefits, over three months after his vaccination, that he specifically claimed onset within the Table timeframe. Opp. at 12 citing Ex. 9 at 22.

These objections are ultimately unpersuasive, however, given the totality of the evidence. First, the records show that Petitioner sought treatment in a relatively timely manner (*i.e.* less than a month after vaccination). It is common for a SIRVA petitioner to delay seeking treatment, thinking the injury will resolve on its own, since patients are often told by medical providers at the time of vaccination to expect some soreness and pain for a period of time after. Here, however, the delay was not appreciably long – and the fact that treatment was sought in a relatively short timeframe is supportive of a close-in-time onset.

Second, Petitioner affirmatively and repeatedly linked his shoulder pain to the flu vaccine as early as November 2, 2018, noting that his shoulder pain developed "after he was administered the influenza vaccination…". Ex. 6 at 26. This reporting provides additional support for onset. Other subsequent medical records also corroborate the contention that Petitioner's pain began within 48 hours of vaccination. *See* e.g., Ex. 16 at 1 (stating "severe left upper extremity pain following a flu shot"); Ex. 3 at 3 (noting shoulder pain occurred after a flu vaccine, and Petitioner's condition was "likely secondary to flu shot."); Ex. 2 at 3 (physical therapy records noting that onset of Petitioner's condition was October 18, 2018).

Accordingly, and based upon the above, I find there is preponderant evidence that establishes the onset of Petitioner's left shoulder pain was more likely than not immediate, and thus within 48-hours of vaccination.

### 3. Petitioner's Pain was Limited to his Left Shoulder

I also find that there is a preponderance of evidence that Petitioner's pain was limited to his left shoulder. *See* Ex. 3 at 3; Ex. 4 at 9, 17-19; Ex. 4 at 18-19; Ex. 6 at 26; Ex. 16 at 1. Petitioner's records consistently report shoulder pain and loss of range of motion, which are consistent with other SIRVA cases. Petitioner's medical procedures were also limited to his left shoulder.

Respondent argues that Petitioner's pain extended to his elbow. Respondent focuses on several instances when Petitioner describes pain radiating from his elbow to his shoulder. Ex. 16 at 1; Ex. 4 at 8; Ex. 5 at 6.[6] Although there are references to pain radiating down Petitioner's left arm in some records, the majority of other records support a finding that Petitioner's pain was limited to his left shoulder. Further, Petitioner explained in his declaration that he would experience bursts of pain that seemed to radiate down his arm. Ex. 22 at 2. However, there is no evidence of neuropathic causes for these symptoms, which can thus be distinguished. *See* Ex. 4 at 11 (EMG study preformed on December 7, 2018, indicating no evidence of neuropathy).

Accordingly, preponderant evidence establishes that Petitioner's actionable, vaccine-induced pain was limited to his left shoulder.

---

[6] Respondent also cites to an examination on November 8, 2018, indicating no reduced range of motion. Ex. 3 at 3. However, records from that same visit note weakness and signs of left shoulder impingement. *Id.* Further, an examination on November 2, 2018, note a limited range of motion due to pain and weakness. *See* Ex. 6 at 27.

### 4. There is No Evidence of Another Condition or Abnormality

The last criteria for a Table SIRVA states that there must be no other condition or abnormality which would explain a petitioner's current symptoms. 42 C.F.R. § 100.3(c)(10)(iv). Respondent has not contested that Petitioner meets this criterion, and I find there is no evidence in the record to the contrary. Thus, the record contains preponderant evidence establishing that there is no other condition or abnormality which would explain the symptoms of Petitioner's right shoulder injury.

### B. Other Requirements for Entitlement

In addition to establishing a Table injury, a petitioner must also provide preponderant evidence of the additional requirements of Section 11(c). Respondent does not dispute that Petitioner has satisfied these requirements in this case, and the overall record contains preponderant evidence to fulfill these additional requirements.

The record shows that Petitioner received a flu vaccine intramuscularly in his left shoulder on October 18, 2018, in New York, NY. Ex. 1 at 1; *see* Section 11(c)(1)(A) (requiring receipt of a covered vaccine); Section 11(c)(1)(B)(i)(I) (requiring administration within the United States or its territories). There is no evidence that Petitioner has collected a civil award for his injury. Ex. 14; Section 11(c)(1)(E) (lack of prior civil award).

As stated above, I have found that the onset of Petitioner's right shoulder pain was within 48 hours of vaccination. *See* 42 C.F.R. § 100.3(c)(10)(ii) (setting forth this requirement). This finding also satisfies the requirement that Petitioner's first symptom or manifestation of onset occur within the time frame listed on the Vaccine Injury Table. 42 C.F.R. § 100.3(a)(XIV)(B) (listing a time frame of 48 hours for a Table SIRVA following receipt of the influenza vaccine). Therefore, Petitioner has satisfied all requirements for a Table SIRVA.

The last criteria which must be satisfied by Petitioner involves the duration of his SIRVA. For compensation to be awarded, the Vaccine Act requires that a petitioner suffer the residual effects of his or her left shoulder injury for more than six months or required surgical intervention. *See* Section 11(c)(1)(D)(i) (statutory six-month requirement). The records demonstrate, and Respondent does not contest, that Petitioner suffered the residual effects of his shoulder injury for more than six months and underwent surgical intervention. *See*, *e.g.*, Ex. 20 at 56, 57 (records showing continued sequala as of February 25, 2020); Ex. 4 at 18-19 (records of Petitioner's arthroscopic surgery). Thus, this requirement is also met.

Based upon all of the above, Petitioner has established that he suffered a Table SIRVA. Additionally, he has satisfied all other requirements for compensation. I therefore find that Petitioner is entitled to compensation in this case.

## VI. Damages

The parties have also briefed damages in this case, which is limited to a request for a pain and suffering award. Petitioner requests $210,000.00 for actual pain and suffering, plus $1,200 per year as a future component. Mot. at 30; Reply at 18. Respondent proposed an award of $122,500.00 for past pain and suffering. Opp. at 23.

### A. Legal Standards for Damages Awards

In several recent decisions, I have discussed at length the legal standard to be considered in determining damages and prior SIRVA compensation within the SPU. I fully adopt and hereby incorporate my prior discussion in Sections III and IV of *Leslie v. Sec'y Health & Hum. Servs.*, No. 18-0039V, 2021 WL 837139 (Fed. Cl. Spec. Mstr. Jan. 28, 2021) and *Johnson v. Sec'y of Health & Hum. Servs.*, No. 18-1486V, 2021 WL 836891 (Fed. Cl. Spec. Mstr. Jan. 25, 2021), as well as Sections II and III of *Tjaden v. Sec'y of Health & Hum. Servs.*, No. 19-419V, 2021 WL 837953 (Fed. Cl. Spec. Mstr. Jan. 25, 2021).

In sum, compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Hum. Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering.[7]

### B. Appropriate Compensation for Pain and Suffering

#### 1. Past Pain and Suffering.

In this case, awareness of the injury is not disputed, leaving only the severity and duration of that injury to be considered. In determining appropriate compensation for pain

---

[7] *I.D. v. Sec'y of Health & Hum. Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) (quoting *McAllister v. Sec'y of Health & Hum. Servs.*, No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

and suffering, I have carefully reviewed and taken into account the complete record in this case, including all medical records, declarations, plus all filings submitted by both Petitioner and Respondent. I have also considered prior awards for pain and suffering in both SPU and non-SPU SIRVA cases and relied upon my experience adjudicating these cases. However, my determination is ultimately based upon the specific circumstances of this case.

Citing three prior damages determinations (*Lawson*, *Schoonover*, and *Hooper*)[8], Mr. Stromer requests an award of $210,000.00 for actual pain and suffering and $1,200.00 per year for Petitioner's remaining life expectancy for future pain and suffering and emotion distress. Mot. at 26-30. He asserts that the severity of his injury is comparable to the aforementioned SIRVA cases. *Id.* at 26-29. In particular, Petitioner emphasizes that he underwent multiple diagnostic tests including MRIs, an EMG, a bone scan, blood work, had surgery, required multiple medications, and attended 60 physical therapy sessions. Mot. at 23. Petitioner's physicians also indicated that he reached a maximum level of medical improvements and was entitled to a 22.5% schedule loss of use per the Worker's Compensation Guidelines. *Id.*

Respondent, by contrast, submits that an award of $122,500.00 is appropriate for pain and suffering. Opp. at 22-23.[9] Respondent argues that Petitioner cannot demonstrate symptomology past February 25, 2020, approximately sixteen months following his vaccination. Opp. at 18. Respondent notes that Petitioner's course of treatment involved surgery, one cortisone injection, and prescription pain medication. Opp. at 22. Respondent cites to *Curri v. Sec'y of Health & Hum. Servs.*, No. 17-32V, 2018 WL 6273562 (Fed. Cl. Spec. Mstr. October 31, 2018) in support of his argument. In *Curri*, petitioner was awarded $120,000.00 for past pain and suffering, was assessed with a 22.5% "scheduled loss of use" and awarded $15,400.00 for future pain and suffering based on evidence of dysfunction well past the point of her reported "maximum medical improvement". Opp. at 22 (citing *Curri* at *6).

Based on the medical records, Petitioner suffered a moderate-to-severe SIRVA. Petitioner initially reported significant pain from November 2018 through January of 2019. *See* Ex. 3 at 3 (reporting pain levels of 8 out of 10 on November 8, 2018); Ex. 4 at 7

---

[8] *Lawson v. Sec'y of Health & Hum. Servs*,, No. 18-882V, 2021 WL 688560 (Fed. Cl. Spec. Mstr. Jan. 5, 2021) (awarding $205,000.00 for actual pain and suffering); *Schoonover v. Sec'y of Health & Hum. Servs.*, No. 13-1324V, 2020 WL 5351341 (Fed. Cl. Spec. Mstr. Aug. 5, 2020) (awarding $200,000.00 for actual pain and suffering and $1,200.00 per year for future pain and suffering); *Hooper v. Sec'y of Health & Hum. Servs.*, No. 17-12V, 2019 WL 1561519 (Fed. Cl. Spec. Mstr. March 20, 2019) (awarding $185,00.00 for actual pain and suffering and $1,500.00 per year for future pain and suffering).

[9] Respondent contends that Petitioner is not entitled to compensation in this case but contends $122,500.00 is just and fair compensation if the Court finds that Petitioner satisfies the legal prerequisites of entitlement.

(reporting pain of 10/10 on December 6, 2018). Petitioner underwent surgery on January 18, 2019 (Ex. 4 at 3) and thereafter began to exhibit steady improvement. Petitioner's surgery appears to have been successful. *See* Ex. 9 at 2-3 (indicating that on April 8, 2019, Petitioner reported he was doing great with almost full mobility and no reports of pain as of May 16, 2019). However, Petitioner reported moderate pain from approximately March through August of 2019. Ex. 2 at 6 (physical therapy record from March 23, 2019, rating his pain as 4/10); Ex. 11 at 32 (record from August 17, 2019, rating his pain as 6/10).[10] By October 22, 2019, Petitioner's pain had significantly reduced. Ex. 18 at 13. However, he continued to report some mild pain with use as late as February 25, 2020. Ex. 20 at 55.

Petitioner also suffered from a reduced range of motion that was initially reported soon after his vaccination. His reduced range of motion was largely unchanged throughout his treatment until at least January 8, 2020. Ex. 18 at 36, 9. At that time, both Dr. Gorski and an independent medical examiner opined that Petitioner had reached his maximum medical improvement and was entitled to a 22.5% Schedule Loss of Use to the left arm. Ex. 18 at 9, Ex. 20 at 57.

These factors indicate that Petitioner's SIRVA was significant for approximately three months, mild to moderate for an additional seven months, with some lingering mild pain upon use. Further, Petitioner's treatment occurred over approximately sixteen months and included surgery, over sixty physical therapy sessions, numerous diagnostic tests including two MRIs, a steroid injection, and prescription medications.

The overall severity of the injury at issue herein is thus not high enough to warrant the $210,000.00 requested by Petitioner in his motion. *Lawson* and *Schoonover*, two SIRVA decisions cited by Petitioner, are distinguishable as they involved multiple surgeries and treatment spanning significantly more time than in Petitioner's case. *Lawson*, 2021 WL 688560 at *5 (explaining that over four years petitioner "underwent an unprecedented three surgeries, seven steroid injections, four rounds of PT, six MRIs, and most recently started PRP injections."); *Schoonover*, 2020 WL 5351341 at *4-5 (describing petitioner's treatment that included two surgeries, manipulation under anesthesia, physical therapy, two steroid injections, and used prescription pain medications, all over the course of two years).

Rather, this case is most analogous to *Blanco v. Sec'y of Health & Hum. Servs.*, No. 18-1361V, 2020 WL 4523473, at *2 (Fed. Cl. July 6, 2020) (awarding $135,000.00 for pain and suffering). As here, the *Blanco* petitioner sought treatment less than a month

---

[10] Petitioner's physicians indicated the pain was "out of proportion" with findings from his diagnostic tests and stated he may be "dealing with some post-traumatic issues." Ex. 10 at 2, 18 at 14.

after her December 27, 2016, flu vaccination and thereafter underwent significant treatment for her injury for over two years, including physical therapy, four steroid injections, three MRI scans, and arthroscopic surgery. *Id.* at *2. That petitioner also reported fluctuating, but at times significant, pain, as in this case. *Id.* ("Although Petitioner's reported pain levels fluctuated during her treatment and prior to her surgery, most frequently she reported a pain level of eight out of ten.").

There are certain factors here that warrant a higher award than in *Blanco*. In particular, Petitioner exhibited significant pain during the summer of 2019 that necessitated in additional diagnostic tests to rule out further complications such as reflex sympathetic dystrophy. See Ex. 18 at 15; ex. 10 at 7. Therefore, due to Petitioner's specific circumstances, an award of $145,000.00 for past pain and suffering is appropriate in this case.

### 2. Future Pain and Suffering

Petitioner also seeks future pain and suffering in the amount of $1,200.00 per year for future pain and suffering and emotional distress, reduced to net present value. Mot. at 30; Reply at 18. There are several reasoned SIRVA damages decisions that have awarded compensation for future pain and suffering. *See*, *e.g.*, *Binette v. Sec'y of Health & Human Servs.*, No. 16-0731V, 2019 WL 1552620 (Fed. Cl. Spec. Mstr. March 20, 2019), *Curri*, 2018 WL 6273562; *Hooper* 2019 WL 1561519.[11]

As a general matter, I am disinclined to award a future component, *unless* there is evidence in the medical record that a treater has confirmed a permanent form of loss. That evidence exists in this case, so a future component is appropriate. Ex. 18 at 9 (Dr. Freeman stating that Petitioner reached the "maximum medical improvement" and was entitled to 22.5% schedule loss of use of his left shoulder).

To calculate the precise amount of future pain and suffering, however, consideration of comparable cases is warranted. Here, I find that Petitioner's prognosis regarding the ongoing nature of his pain and suffering is similar to that of the petitioner in *Curri*. *Curri*, 2018 WL 6273562. That petitioner filed a record from her orthopedist stating that petitioner's left shoulder "had reached its 'maximum medical improvement,' leaving her with a permanent 'scheduled loss of use' of 22.5 percent of her left arm." *Id.* at *2. The special master awarded petitioner $550.00 per year for her future pain and suffering considering petitioner's "significant arm and shoulder pain, her permanently reduced

---

[11] Petitioner compares his condition to that of the petitioner In *Hooper*. However, it is important to stress that the petitioner in *Hooper* was assessed as having a permanent disability of 50 percent, *i.e.* a permanent partial loss of functionality twice as severe as in Mr. Stromer's case. *Hooper*, 2019 WL 1561519, at *9-10.

range of motion, and the unique challenges her shoulder injury creates in her day-to-day life as a working mother of three children." *Id*. at *7.

In this case, there is a similar statement from two physicians, Dr. Freeman and Dr. Miller. Ex. 18 at 9 and Ex. 20 at 57. Both doctors found that Petitioner had reached his maximum medical improvement and was entitled to a 22.5% schedule loss of use of his left shoulder. Ex. 18 at 9, Ex. 20 at 57. I find that the petitioner *Curri* had additional confounding factors, when compared with Mr. Stromer, but that the facts of this case are similarly close enough to *Curri* to award a comparable future pain and suffering amount. Therefore, I find that $500.00 annually for future pain and suffering is appropriate based on the facts of this case. This amount is to be reduced to net present value consistent with my calculation in *Dillenbeck v. Sec'y of Health & Human Servs.*, No. 17-428V, 2019 WL 4072069 (Fed. Cl. Spec. Mstr. July 29, 2019) (one percent net discount rate for the first fifteen years of the award, followed by a two percent net discount rate for any remaining years).

## VII. Conclusion

**In view of the evidence of record, I find that there is preponderant evidence that the onset of Petitioner's injury, specifically shoulder pain, was within 48 hours of his vaccine and his pain was limited to his left shoulder. Further, based on the evidence of record, I find that Petitioner is entitled to compensation.**

I also find that, for all of the reasons discussed above and based on consideration of the record as a whole, **$145,000.00 represents a fair and appropriate amount of compensation for Mr. Stromer's actual pain and suffering.**[12] I also find that an award of **$500.00 per year, reduced to net present value of 15,677.5,**[13] is appropriate compensation for future pain and suffering.

---

[12] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required. *See* § 15(f)(4)(A); *Childers v. Sec'y of Health & Hum. Servs.*, No. 96-0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Hum. Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

[13] A one percent discount rate is used for the first fifteen years, with a two percent discount rate used for any additional years. *Curri v. Sec'y of Health & Human Servs.*, No. 17-0432V, 2018 WL 6273562, at *7 (Fed. Cl. Spec. Mstr. Oct. 31, 2018). The Social Security Administration (SSA) calculates life expectancy. Their life expectancy calculator can be found at https://www.ssa.gov/OACT/population/longevity.html (last visited April 7, 2022). Mr. Stromer's date of birth is May 3, 1977, and his remaining life expectancy is approximately 36 years. As in *Curri*, an online present value calculator was used to perform the appropriate calculations. 2018 WL 6273562, at *7 n.4; *see* https://financial-calculators.com/present-value-of-an-annuity-calculator (compounding annually) (last visited April 7, 2022). Utilizing a one percent discount rate for years 1 through 15, the total of $7,500.00 ($500 multiplied by 15) is reduced to a net present value of $7,001.85. Utilizing a two percent discount rate for years 16 through 36, the total amount of $10,500.00 ($500 multiplied by 21) is reduced to a net present value of $8,675.72.

**IT IS SO ORDERED.**

<u>**s/Brian H. Corcoran**</u>
Brian H. Corcoran
Chief Special Master